UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

THE HURD FAMILY PARTNERSHIP, L.P.,             Plaintiff,

v.             Civil Action No. 3:13-cv-485-DJH

THE FARMERS BANK, et al.,             Defendants.

\* \* \* \* \*

**MEMORANDUM OPINION AND ORDER**

This case revolves around a bad loan. The Plaintiff, Hurd Family Partnership, is a minority shareholder of the primary borrower, Freedom Holding, Inc., which has defaulted on the loan. The Farmers Bank was one of three banks originally involved in the 2008 loan participation agreement that first funded the loan to Freedom Holding, but Farmers is the only bank named as a defendant in this case. In subsequent transactions, Farmers bought out the original loan in 2010, and then refinanced it in 2012.

Farmers has filed two motions for summary judgment. The first motion requests judgment against the Partnership on its claims that Farmers improperly loaned money to Freedom Holding in 2008. (Docket No. 59) The second motion (D.N. 60) requests judgment on Farmers' cross-claims against two of Farmers' co-defendants, Freedom Holding and W. Bennett Collett, Sr., for debts owed pursuant to the loan agreements executed in 2012. Collett, Sr. and Freedom Holding admit that Farmers Bank is entitled to summary judgment on those 2012 instruments and "cannot dispute the amount sought." (D.N. 63, PageID # 553) But Farmers' motion against the Partnership regarding the original 2008 loan is disputed. (D.N. 81) After careful consideration of the parties' briefs and following oral argument, the Court will grant both motions for summary judgment.

1

## I.   FACTUAL BACKGROUND

Many of the facts are undisputed. The Partnership is a minority owner of Freedom Holding, with 5.6% of the corporate stock. (D.N. 59-1, PageID # 342) W. Bennett Collett, Sr. holds about 84% of the stock, and his son, W. Bennett Collett, Jr., owns the remainder. (*Id.*) The Partnership alleges that Freedom Holding's only asset was stock in Florida Gaming Corporation (FGC). (D.N. 1, PageID # 3) Though Freedom Holding did not own the majority of FGC's stock, Bennett "knew enough 'friendly people' to exercise control." (D.N. 59-1, PageID # 342; D.N. 59-3, PageID # 378) In turn, FGC owned Florida Gaming Centers, Inc., which operated two Jai-Alai gambling operations in Florida. (*Id.*) The Partnership trusted Collett, Sr., to run Freedom Holding. (*Id.*)

Collett, Sr. planned to drive up the stock price of FGC in order to later sell off control at a profit. (*Id.*) But FGC was in financial trouble in 2008 and needed more capital. (*Id.*) The Colletts owned stock options that enabled them to purchase FGC stock for $2.25 per share. (*Id.*) The options, however, were about to expire. (*Id.*) And so, to inject more capital and take increased control over FGC, Collett, Sr. approached King Southern Bank in early 2008 for a loan to be used to exercise the stock options. (*Id.*, PageID # 343) King Southern directly interacted with the Colletts and negotiated the terms of a loan. In contrast, Farmers Bank "never negotiated this loan with Bennett [Collett, Sr.], Bennie [Collett, Jr.] or Freedom Holding. All the negotiations were done with King Southern." (*Id.*) Farmers only became involved later when, in February or March 2008, Jim King, president of King Southern contacted Farmers to gauge its interest in buying the $1.3 million loan that King Southern agreed to make to Freedom Holding. (*Id.*) King was worried about a conflict of interest because, in addition to being the president of King Southern Bank, he also provided accounting services to Freedom Holding and FGC as a

Certified Public Accountant. (*Id.*) Instead of buying the loan outright, however, King Southern and Farmers agreed to the terms of a loan participation agreement: Farmers provided $650,000 of the loan and its sister bank, Leitchfield Deposit Bank,[1] provided the other $650,000. (*Id.*, PageID # 345) In other words, King Southern "dealt with the customer, closed the loan, and distributed the proceeds to the customer," while Farmers funded the loan. (*Id.*) King Southern closed the loan in March 2008. (*Id.*, PageID # 346) The promissory note between Freedom Holding and King Southern indicates that "[a] portion of the loan proceeds are to be used to exercise the stock options for 335,000 of [FGC] shares." (*Id.*) Under the participation agreement between King Southern and Farmers, King Southern continued to service the loan. King Southern ultimately extended the maturity date of the loan from March 2009 to March 2010. (*Id.*, PageID # 348)

In March 2010, Jim King essentially asked Farmers to buy out the participation agreement with King Southern and make a new loan in the same principal amount directly to Freedom Holding. (*Id.*, PageID # 349) Farmers agreed and completed a transaction in March 2010 that resulted in it becoming the lending bank from that point forward. (*Id.*) Then, in June 2012, new loan agreements were executed between Farmers and the borrowers, with Freedom Holding signing a promissory note for $1,300,000.00, and Collett, Sr. signing a commercial guaranty agreement as security for the note. (D.N. 60-1, PageID # 474-75) In February 2013, the loan became delinquent, prompting a meeting between Farmers and Collett, Jr., who said that Freedom Holding planned to sell its assets to pay the loan in full, or reduce it significantly.

---

[1] Apparently, Farmers Bancshares, Inc. owns both Farmers Bank and Leitchfield Deposit Bank. (D.N. 59-1, PageID # 345)

(D.N. 59-1, PageID # 349)  Yet, that plan failed to result in a significant reduction of the loan principal. (*Id*.)  The Florida casinos have been sold and the stocks that were put up as collateral for the original loan from King Southern are now worthless. (*Id*.)

Following the collapse of the loan, the Partnership sued Farmers claiming that Farmers had a duty to determine that the loans were properly used for Freedom Holding's corporate purposes. (*Id*., PageID # 350)  It further alleges that the Freedom Holding board of directors failed to approve the loan properly, and that King Southern and Farmers were aware of the ultra vires[2] purpose behind the loan. (*Id*.)  The question of whether the directors approved the loan is perhaps the most contested factual matter.  Farmers claims that a document signed by Kim Tharp, Freedom Holding's secretary, is proof of sufficient corporate authorization for the loan. The Partnership retorts, though, that the Tharp document is actually a "certification of authority," which it claims does not comply with the relevant law regarding the contents and validity of a corporate resolution. (D.N. 61-1, PageID # 498)  The Partnership also claims that the relevant law precluded Collett, Sr., and Collett, Jr. from forming a majority of the board as they were also officers managing the corporation.[3] (*See id*.)

Related to the question of whether Freedom Holding's directors properly approved the loan is a dispute about whether Robert L. Hurd (the principal of the Partnership) was a director of Freedom Holding when the loan was made and whether he approved it. (*See id*., PageID #

---

[2] That is, the Partnership alleges that Farmers and King Southern knew that seeking the loan was beyond the legal power or authority of those acting on behalf of Freedom Holding. *See Wilson v. Louisville Trust Co*., 46 S.W. 2d 767, 770 (Ky. 1932).
[3] Though the Court includes these arguments for the sake of completeness, these arguments appear irrelevant because, as explained below, the debts were later ratified, which would have cured the earlier defect.

4

351) Hurd did not sign the certificate of authority approving the loan. (*See* D.N. 61-1, PageID # 499) But the Partnership has provided a valid resolution from March 2008—two days after the loan issued—signed by Hurd, as a director of Freedom Holding. (*Id.*, PageID # 500) The Partnership believes the discrepancy between that March 2008 resolution and the Tharp-signed certificate of authority proves that the Colletts kept Hurd in the dark on some matters, such as the loan. Hurd's own testimony was that he was a director at the time of the loan, that he knew nothing about the loan, and that he would not have approved of the loan had he known about it. (*Id.*, PageID # 500-01) He did, however, acknowledge the debt and ratified its existence in April 2011. (*Id.*, PageID # 351) A stockholder agreement indicates that Hurd became director of Freedom Holding after "the funding of the Gaming debt" and that he was set to serve in that capacity "as long as the Holding shares and/or the [FGC] shares are subject to liens and pledges to secure the Farmers debt or the [FGC] debt." (*Id.*)

      Given the disputes about Hurd's involvement, the Partnership argues that Farmers did too little due diligence as a participant purchaser of the loan. (*Id.*, PageID # 500) Indeed, it argues that the testimony of Farmers' own president proves that *no* independent underwriting was done prior to joining the original loan transaction via the participation agreement. (*Id.*) Farmers' counsel essentially said as much at the November 2015 hearing. All of this means, the Partnership argues, that a genuine factual dispute exists as to whether Hurd knew of and consented to the loan. As for Hurd's supposed ratification of the debt, the Partnership contends that Hurd signed the shareholder agreement only years after the debt was issued—when he was first told of its existence—and that he had little choice but to sign it in the hopes of salvaging the situation. (*Id.*, PageID # 502)

Finally, the Partnership challenges the way Farmers has characterized the loan underwriting. (*See id.*, PageID # 503) It particularly notes two phrases from the participation agreement: "[Farmers] acknowledges that it has made an independent investigation" and "[Farmers] acknowledges that it is not relying upon [King Southern's] judgment." (*Id.*) To the Partnership, those phrases—along with the reality that King Southern put up no money for the loan—mean that Farmers cannot shed itself of responsibility for the allegedly poor due diligence. (*Id.*, PageID # 504)

Farmers' request for summary judgment depends largely on a simple, though critical, point: Farmers merely participated in the original 2008 loan. (*See, e.g.,* D.N. 59-1, PageID # 352) Farmers relies on case law to argue that it owed the Partnership no duty and that it committed no wrong when it participated in the original King Southern loan. It also disputes that the Partnership has a claim against it under Kentucky's ultra vires statute. (*Id.*, PageID # 356-57) Meanwhile, Farmers cross-claimed to recover on the 2012 promissory note executed with Freedom Holding, and a commercial guaranty agreement with Collett, Sr. (D.N. 60) Collett, Sr. and Freedom Holding admit that "Farmers Bank is entitled to summary judgment on the agreements [Collett, Sr. and Freedom Holding] executed and that they cannot dispute the amount sought." (D.N. 63, PageID # 553)

## II. STANDARD

To grant a motion for summary judgment, the Court must find that there is no genuine dispute as to any material fact and that the moving party is entitled to summary judgment as a matter of law. Fed. R. Civ. Pr. 56(a). The moving party bears the initial burden of identifying the basis for its motion and the parts of the record that demonstrate an absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court must

determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). When interpreting a contract, the Court must consider the agreement as a whole and give meaning and effect to all of its provisions. *Paper, Allied Indus., Chem. & Energy Workers Int'l Union v. Air Prods. & Chems., Inc.*, 300 F.3d 667, 676 (6th Cir. 2002) (citation omitted).

### III. DISCUSSION

The Partnership's suit against Farmers boils down to this: the Partnership wants to hold Farmers accountable for making a loan to Freedom Holding that the Partnership did not approve and that was improperly utilized. This case may present genuine factual disputes about the facts surrounding the inception of the loan, but those disputes are immaterial to the Partnership's legal claims. A seemingly obvious target for the Partnership's suit—King Southern—was never made a party to this case. Farmers was just a participant in the original loan. As such, it cannot be said that Farmers owed the Partnership any duty.

A participation agreement occurs when "two or more banks join a loan with each bank lending a portion of the amount to the borrower." Patrick J. Ledwidge, *Loan Participations Among Commercial Banks*, 51 Tenn. L. Rev. 519, 520 (Spring 1984) (internal quotations omitted; citation omitted). Participation agreements assign "an interest in an intangible right," constitute a "contract that prescribes duties of servicing the loan," and can create agency relationships. *Id*. When the lending bank and participating banks sign a participation agreement, the lending bank often executes and delivers a simple document, called the "certificate of participation," to the participating bank. *Id*. at 521. Importantly, a true participation agreement

7

does not create a debtor-creditor relationship between the lending and participating banks; the lending bank does not promise to pay off a debt, it simply promises to remit the participating bank's share of the borrower's repayments. *Id.* at 524. Put another way, participation agreements are not themselves loans. *In re AutoStyle Plastics, Inc.*, 269 F.3d 726, 736 (6th Cir. 2001). They are contractual arrangements where a third party provides funds to a lender so the lender can execute a loan with a borrower. *Id.* (citing *Natwest USA Credit Corp v. Alco Standard Corp.*, 858 F. Supp. 401, 407-08 (S.D.N.Y. 1994)).

Here, the undisputed facts establish that the original arrangement between King Southern and Farmers meets the traditional understanding of a participation agreement, as described in the Ledwidge article. Under that arrangement, King Southern was the lending bank and Farmers was one of two participating banks. King Southern made the loan to Freedom Holding with funds supplied to it by Farmers and another participating bank. (D.N. 59-1, PageID # 345) Farmers entered into a contractual relationship—a participation agreement—with King Southern. (*Id.*) Under the participation agreement, King Southern did not owe Farmers a debt; it merely sent remittances of Farmers' share of the loan proceeds.

Importantly, participation agreements also do not create a legal relationship between the participating bank and the borrower. The borrower's only contractual relationship is with the lending bank. And a participating bank's only contractual relationship is also with the lending bank. *Loan Participations*, 51 Tenn. L. Rev. at 528. That means that, if the arrangement between Farmers and King Southern really was a participation agreement, then Farmers had no agreement with Freedom Holding at the time of the original loan in 2008. Therefore, if it were a true participation agreement, Farmers would have had no legal relationship with or obligations to Freedom Holding.

Consistent with the description of participation agreements in the Ledwidge article, the Sixth Circuit has adopted its own four-factor definition of a "true" participation agreement. Those factors are: (1) the participating bank must advance money to the lending bank; (2) the participating bank is only repaid when the lending bank is paid; (3) only the lending bank may seek legal recourse against the borrower; and (4) the participation agreement evidences "the parties' true intentions." *In re AutoStyle*, 269 F.3d at 737. From the undisputed facts, it is clear that each factor is met in this case. Farmers advanced money to King Southern to fund the loan. (D.N. 58-1, PageID # 345) King Southern remitted money back to Farmers as Freedom Holding made its payments to King Southern. (*See id.*, PageID # 348) As the lending institution, King Southern continued to service the loan and was the only bank that had a contractual relationship with Freedom Holding. And nothing indicates that the three banks involved in the participation agreements intended it to be something different. The agreement between King Southern and Farmers meets the Sixth Circuit's definition. The arrangement at issue was a participation agreement.

If the participating bank's only contractual relationship is with the lending bank, implying that the participating bank would have no legal recourse against the borrower in the event of, say, default, *see id.*, the converse should also be true in most cases. If there is no contractual relationship between the participating bank and the borrower, rarely would the borrower have legal recourse against the participating bank. In its complaint, the Partnership actually characterized the original loan as coming from Farmers. (*See* D.N. 1, PageID # 3 ("[Freedom] Holding borrowed money from Farmers Bank . . . .")) Had that been the case, perhaps its claims would have proved sturdier. But the Partnership cannot refute that this was a true participation agreement.

9

In briefing, the Partnership gripes that King Southern "put up absolutely no money on the loan." (D.N. 61-1, PageID # 504) Its implication is that Farmers was the truly responsible party. Yet the Partnership provided no authority, and the Court has found none, indicating that the lending bank must use some of its own funds. Again, the Sixth Circuit's adopted elements address funding only to say that the participating bank must advance money to the lender. *See In re AutoStyle*, 269 F.3d at 737. Indeed, because "a participation [agreement] is, by its nature, contractual, the parties to a participation agreement may choose whatever terms they wish and the agreement will generally be enforced as to its terms." *Id*. at 736 (citation omitted). On that topic, the Partnership's reference to the terms of the participation agreement is likewise unavailing. It points out that the participation agreement contains language saying Farmers conducted an "independent investigation" and acknowledged that it was "not relying upon" King Southern's judgment. The Partnership cites these excerpts apparently in an attempt to show that Farmers *should* have done more underwriting and that, if it had, it would have seen the ultra vires nature of the loan. But this language protects the lending bank from a participating bank. The language would have, for example, prevented Farmers from claiming King Southern had deceived it as to the credit strength of the borrower. Freedom Holding was not a party to the participation agreement nor a beneficiary of its terms. If Farmers failed to conduct the necessary due diligence prior to funding the participation agreement, the language at issue would presumably prevent Farmers from recovering from King Southern as a result of the failed loan. As the lending bank, King Southern, and not Farmers, was responsible for the underwriting that the Partnership now complains about.

Farmers owed Freedom Holding, and, by extension, the Partnership, no fiduciary duty. Under Kentucky law,[4] a fiduciary relationship exists when one entity, the fiduciary, has a duty "'to act primarily for another's benefit.'" *In re Sallee*, 286 F.3d 878, 892 (6th Cir. 2002) (quoting *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 485 (Ky. 1991)). Because there was no relationship between Farmers and Freedom Holding, it cannot be said that the two had a relationship "founded on trust or confidence reposed in the integrity and fidelity of another." *Steelvest*, 807 S.W.2d at 485. In some circumstances, the fiduciary duty of another can be imputed to a third party when the third party knowingly fails to prevent the fiduciary from violating its duty. *Jackson v. Smith*, 254 U.S. 586, 589 (1921). To be operative here, though, that precedent would require King Southern to have had a fiduciary relationship with Freedom Holding. Typically, there is no fiduciary relationship between a lender and a borrower; indeed, Kentucky has only twice extended such a duty, and the rationale (the lender profited from the confidential information of the borrower) behind those departures from the norm is not present here. *See Sallee*, 286 F.3d at 893. There is no reason to believe that Farmers owed Freedom Holding or the Partnership any duty.

True, Farmers did ultimately buy out its participation agreement in 2010. This cut out King Southern and created a direct lender-borrower relationship between Farmers and Freedom Holding. But, by then, the harms the Partnership complains of had already been done.

Finally, the parties sparred over whether Farmers is liable under Kentucky's ultra vires statute because the funds loaned to Freedom Holding were not used for the corporation's benefit.

---

[4] In briefing, the Partnership made several comments like, "Kentucky law (if applicable)," as if it were calling into question what substantive law the Court should apply. And yet, the Partnership never argued that Kentucky law was inapplicable, and the Court sees no indication that it is.

This assertion was not made in the complaint but instead came up in one of the Partnership's answers to an interrogatory. (*See* D.N. 59-1, PageID # 356) The assertion fails. The statute indicates that when a shareholder attempts to enjoin or set aside an "unauthorized corporate act," the Court may do so "if equitable and if all affected persons are parties to the proceeding." KRS § 271B.3-040. It would be inequitable to do so here. Farmers was not responsible for the underwriting on this loan;[5] at the outset, it merely participated in the loan. Had Farmers conducted more detailed research, perhaps it would have declined to participate in the loan, but that speculation—despite being grounded in common sense—is not enough to save the Partnership's case.

### IV.     CONCLUSION

Perhaps the Partnership has some legitimate complaint about how the Freedom Holding loan was handled. But Farmers is not the proper target for the Partnership's ire. There was no contractual relationship between the Partnership and Farmers, and so Farmers owed the Partnership no special duty. Summary judgment is appropriate. Accordingly, and being otherwise sufficiently advised, it is hereby

**ORDERED** as follows:

(1) Defendant Farmers Bank's motion for summary judgment against Plaintiff The Hurd Family Partnership (D.N. 59) is **GRANTED** and the Partnership's claims against Farmers are **DISMISSED WITH PREJUDICE**.

---

[5] It seems obvious that the better practice for a participating bank is to conduct meaningful due diligence prior to joining a participation agreement and advancing funds. But acknowledging that is very different from concluding that Farmers, as a participating bank, was required to perform the same due diligence required of a lending bank, or verify the lending bank's loan underwriting.

(2) Farmers' motion for summary judgment on its cross-claim against Freedom Holding and W. Bennett Collett (D.N. 60) is **GRANTED**. Freedom and W. Bennett Collett are liable for the promissory note and commercial guaranty agreement executed in 2012.

March 9, 2016

**David J. Hale, Judge**
**United States District Court**